IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOHN M. HERRMANN and, | ) | |
| PAMELA SHELTON HERRMANN, | ) | |
|     Plaintiffs, | ) | Civil Action No. 7:19-cv-00827 |
| | ) | |
| v. | ) | By: Elizabeth K. Dillon |
| | ) |     United States District Court Judge |
| WELLS FARGO BANK, N.A. | ) | |
|     Defendant. | ) | |

**MEMORANDUM OPINION**

Pending before the court is Wells Fargo's motion for judgment on the pleadings (Dkt. No. 9) and the Herrmanns' motion for leave to file a second amended complaint (Dkt. No. 22). These matters have been fully briefed and are ripe for resolution. For the reasons stated below, the court will grant in part and deny in part the motion for judgment on the pleadings and grant the motion for leave to file a second amended complaint.

I. BACKGROUND

**A. Factual Background**

Plaintiffs John M. Herrmann and Pamela Shelton Herrmann are married and reside in Blacksburg, Virginia. (Am. Compl. ¶ 4; Dkt. No. 3.). Defendant Wells Fargo is a national bank that does business in Virginia. (*Id.* ¶ 5.) Wells Fargo and Wachovia merged in 2011. (*Id.* ¶ 8.)

In December 2006, the Herrmanns obtained a home equity line of credit from Wachovia, which was secured by a deed of trust on the Herrmanns' residence. (*Id.* ¶ 6–7.) In 2011, Wells Fargo began to service this loan. (*Id.* ¶ 8.) "After Wells Fargo took over servicing the account, [the Herrmanns] became frustrated with their inability to understand the monthly statements and how their payments were being applied to their account." (*Id.* ¶ 12.)

1

In December 2017, as part of an effort to refinance their debt, the Herrmanns "requested a payoff amount." (Am. Compl. ¶ 14.) Wells Fargo demanded that the Herrmanns pay $85,159.97 to mark the account closed and release the deed of trust. (*Id.* ¶ 15.) The payment "included $85,117.97 as the amount that Wells Fargo demanded on the account, and $42.00 to record a lien release." (*Id.* ¶ 16.) The Herrmanns allege that the amount to pay off the account should have been less than $84,000.00. (*Id.* ¶ 17.) Nevertheless, "[o]n December 12, 2017, [the Herrmanns] paid the amount that Wells Fargo demanded." (*Id.* ¶ 19.)

In January 2018, the Herrmanns began to question the payment that Wells Fargo demanded and sent multiple written requests inquiring about the payment. (*Id.* ¶ 20.) The Herrmanns state that these letters were Qualified Written Requests (QWRs) under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601 *et seq.* (Am. Compl. ¶ 21.) A QWR is a "term is defined under RESPA's home equity account servicing dispute resolution provisions governing the duty of servicers to respond to borrower inquiries." (*Id.*) The Herrmanns state that "[e]ach QWR was also a 'notice of error' under 12 C.F.R. § 1024.35(e)." (*Id.*) Wells Fargo sent multiple letters to the Herrmanns in response to these QWRs. Between January 2018 and November 2019 Wells Fargo sent the Herrmanns 13 letters about the disputed payment, and the Herrmanns claim that each letter failed to resolve the dispute. The correspondence between Wells Fargo and the Herrmanns is as follows:

- On January 3, 2018, Wells Fargo's Kelly Nash sent the Herrmanns a letter and a spreadsheet that explained how Wells Fargo determined the payoff amount. (*Id.* ¶ 23–24.) The Herrmanns claim this spreadsheet "was riddled with errors" which they tried to explain to Wells Fargo. (*Id.* ¶ 25–26.)

- On January 25, 2018, Wells Fargo's Kyle Gallinger sent the Herrmanns a letter and spreadsheet explaining how Wells Fargo calculated the payoff amount. (*Id.* ¶ 27–28.) The spreadsheet attached to this letter differed significantly from the spreadsheet attached to the prior letter, but the Herrmanns allege that this spreadsheet also had "numerous unexplained and confusing entries." (Am. Compl. ¶ 32.)

2

- On March 19, 2018, Wells Fargo's Brandi Walker sent a letter stating that Wells Fargo has investigated the Herrmanns' account and found no error. (*Id.* ¶ 36.) "This letter included a copy of the credit agreement and [] explain[ed] how the interest was assessed and payments applied," but "failed to address the discrepancy in how [certain] payments were applied, with some going entirely to principal and others going entirely to interest." (*Id.* ¶ 38–39.)

- On April 17, 2018, Wells Fargo's Tricia Paliswiat sent a letter to the Herrmanns, again stating that Wells Fargo had investigated the account and found no error. (*Id.* ¶ 41–42.) Wells Fargo attached a new spreadsheet titled Interest Recalculations for Line of Credit, which the Herrmanns claim "was also riddled with errors." (*Id.* ¶ 44.)

- On June 13, 2018, Wells Fargo's David Watz sent the Herrmanns a letter again stating that Wells Fargo had investigated the account and found no error. (*Id.* ¶ 49.) The Herrmanns claim this letter did not explain why some payments were applied only to principal. (Am. Compl. ¶ 50.)

- On October 24, 2018, Wells Fargo's Kelly Marlatt sent the Herrmanns a letter again stating that Wells Fargo had investigated the account and found no error. (*Id.* ¶ 54.) The Herrmanns reiterated their objections. (*Id.* ¶ 58.)

- On November 14, 2018, Wells Fargo's Fahreta Mehmedovic sent the Herrmanns a letter reiterating that there was no error. (*Id.* ¶ 59.) This letter noted that "the recalculation summaries that had previously been provided were not a complete transaction history" and attached a new, more comprehensive spreadsheet called Recalculations for Line of Credit. (*Id.* ¶ 63–64.) The Herrmanns claim that this spreadsheet was also riddled with errors and continued to complain to Wells Fargo. (*Id.* ¶ 65.)

- On January 9, 2019, Wells Fargo's Fahreta Mehmedovic sent the Herrmanns another reiterating that the account had been handled properly. (Am. Compl. ¶ 68–71.) The Herrmanns continued to dispute the payoff calculation. (*Id.* ¶ 74.)

- On April 19, 2019, Wells Fargo's Danielle Santee sent the Herrmanns another letter which again explained that the account payments had been handled properly. This letter "admitted that the explanations for the interest calculations Wells Fargo had provided in its letters of March 19, 2018, and April 17, 2018, were 'not accurate' and 'incorrect.'" (*Id.* ¶ 75–79.) However, the "letter did not address the errors in the recalculation summaries that had previously been provided" and therefore, the Herrmanns continued to dispute the payment. (*Id.* ¶ 80–81.)

- On July 8, 2019, Wells Fargo's Kyle Welbourne sent the Herrmanns another letter. This letter "acknowledged that Wells Fargo had assigned multiple different representatives to respond to Plaintiffs' concerns," but "did not address the errors in the recalculation summaries that had previously been provided." (*Id.* ¶ 82–87.) The Herrmanns continued to dispute the payment. (*Id.* ¶ 88.)

- On October 1, 2019, Wells Fargo's Justin Snyder sent the Herrmanns another letter reiterating that the account had been handled properly. "Wells Fargo told the Plaintiffs that 'there is nothing additional that can be provided regarding these concerns and additional escalations will not change the outcome.'" (Am. Compl. ¶ 92.) Wells Fargo explained that the previous spreadsheets only showed regular payments that were made, not principal payments. (*Id.* ¶ 93.) Wells Fargo attached a new chart, "this one purporting to show its previously undisclosed allocation of principal and interest payments." (*Id.* ¶ 94.) The Herrmanns continued to dispute the payoff amount. (*Id.* ¶ 95.)

- On October 18, 2019, Wells Fargo's Taiya Glas sent the Herrmanns another letter "again insisting that it had handled their account properly and that no corrections were warranted." (*Id.* ¶ 96–98.) Wells Fargo "claimed that it was unable to determine if it had provided inconsistent information to the Plaintiffs" and "demanded that the Plaintiffs provide additional facts about the contradictory information that Wells Fargo had provided them." (*Id.* ¶ 99.) The Herrmanns continued to dispute the payoff amount. (Am. Compl. ¶ 100.)

- On November 25, 2019, Wells Fargo's Danielle Santee sent the Herrmanns another letter again stating that the account had been handled properly. (*Id.* ¶ 101–02.) Wells Fargo told the Herrmanns "that they had not provided any new information that would change its earlier responses," and therefore, Wells Fargo considered the matter resolved and would provide no further responses. (*Id.* ¶ 104–05.)

The Herrmanns claim that despite all the above listed correspondence, Wells Fargo never provided a proper RESPA response to their QWRs. (*Id.* ¶ 106.) The Herrmanns subsequently hired an accountant to interpret the inconsistent information they received from Wells Fargo. The accountant determined that the actual payoff amount was far less than what Wells Fargo demanded. (*Id.* ¶ 110.)

**B. Procedural Background**

On December 10, 2019, the Herrmanns filed suit against Wells Fargo alleging a violation of RESPA, 12 U.S.C. § 2605(e)(2), for failure to properly respond to QWRs; a violation of RESPA, 12 U.S.C. § 2605(k)(1)(E), for failure to follow regulations established by the Consumer Financial Protection Bureau; and conversion. (Compl.; Dkt. No. 1; Am. Compl. ¶ 111–19 (Plaintiffs filed an Amended Complaint on January 6, 2020).)

On April 30, 2020, Wells Fargo filed a motion for judgment on the pleadings. (Dkt. No. 9.) Wells Fargo argues that the Herrmanns RESPA claims fail because RESPA does not apply to home equity lines of credit. (Def.'s Br. 2; Dkt. No. 10.) Wells Fargo further argues that the Herrmanns QWRs were defective, Wells Fargo fully satisfied its obligations under RESPA by providing at least thirteen (13) detailed responses, and the Herrmanns fail to plausibly allege any damages resulting from the purported RESPA violation. (*Id.*) In addition, Wells Fargo argues that the conversion claim fails as a matter of law because it is barred by the economic loss rule and the Herrmanns fail to allege facts sufficient for conversion. (*Id.*)

The Herrmanns filed a response in opposition to the motion for judgment on the pleadings. (Pls.' Resp.; Dkt. No. 11.) The Herrmanns argue that judgment on the pleadings is inappropriate because Wells Fargo does not accept all the alleged facts as true. (*Id.* at 4.) Moreover, the Herrmanns argue that RESPA does apply to their home equity line of credit, they submitted proper QWRs, Wells Fargo failed to conduct a reasonable investigation, and they have adequately pled damages. (*Id.* at 6–21.) Finally, the Herrmanns reassert that they have adequately state a claim for conversion. (*Id.* at 21.) Wells Fargo has filed a reply in support of its motion for judgment on the pleadings. (Def.'s Reply, Dkt. No. 13.)

On January 4, 2021, the Herrmanns filed a motion for leave to file a second amended complaint. (Dkt. No. 22.) The Herrmanns seek to address Wells Fargo's objections to its conversion claim and to its factual allegations in an amended complaint. (*Id.* at 2.) Wells Fargo filed a response objecting to the motion for leave to file a second amended complaint due to prejudice. (Dkt. No. 23.) On March 12, 2021, Wells Fargo filed an amendment to its response, again arguing that granting the Herrmanns' motion would be prejudicial and adding that it is also

5

futile. (Dkt. No. 49.) The Herrmanns filed a reply arguing that leave to amend would be neither prejudicial to the defendant nor futile. (Dkt. No. 50.)

## II. DISCUSSION

**A. Standard of Review**

"Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move for judgment on the pleadings." *Hardy v. Lewis Gale Med. Ctr.*, LLC, 377 F. Supp. 3d 596, 604–05 (W.D. Va. 2019). "In reviewing a Rule 12(c) motion filed by a defendant, the court applies the same standard that would apply to a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Id.* (citing *PETA v. U.S. Dep't of Agric.*, 861 F.3d 502, 506 (4th Cir. 2017)). "Thus, the court may grant the Defendant's Rule 12(c) motion only 'if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" *Id.* at 604–05 (quoting *PETA*, 861 F.3d at 506); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (requiring a complaint to contain facts sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face").

On a Rule 12(c) motion, a court is "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Community. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citing *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013)). "However, [a court may] also consider documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Civ. P. 10(c)). In addition, a court "may consider a document submitted by the movant that was not attached to or expressly incorporated in a

6

complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citing *Sec'y of State For Defense v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). "To be 'integral,' a document must be one 'that by its very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Whetstone v. Mayor & City Council of Baltimore City*, No. CV ELH-18-738, 2019 WL 1200555, at *5 (D. Md. Mar. 13, 2019) (quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)).

## B. RESPA

### 1. Applicability to Home Equity Line of Credit

"The Real Estate Settlement Procedures Act (RESPA) was passed in 1974 in an effort to reform the real estate settlement process to 'insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.'" *Bowman v. Vantium Cap., Inc.*, No. 4:13-CV-00063, 2014 WL 109463, at *3 (W.D. Va. Jan. 13, 2014) (quoting 12 U.S.C. § 2601(a)).

RESPA applies to "federally related mortgage loans." 12 U.S.C. § 2605(e). RESPA defines a "federally related mortgage loan" as any loan (other than temporary financing such as a construction loan) which:

> (A) is secured by a first or subordinate lien on residential real property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from one to four families, including any such secured loan, the

proceeds of which are used to prepay or pay off an existing loan secured by the same property; and
(B)(i) is made in whole or in part by any lender the deposits or accounts of which are insured by any agency of the Federal Government, or is made in whole or in part by any lender which is regulated by any agency of the Federal Government . . . . 12 U.S.C. § 2602(1).

Regulation X, issued by the Consumer Financial Protection Bureau to implement RESPA provides that a "[m]ortgage loan means any federally related mortgage loan, as that term is defined in § 1024.2 subject to the exemptions in § 1024.5(b), but does not include open-end lines of credit (home equity plans)."[1] 12 C.F.R. § 1024.31. Thus, Regulation X appears to narrow the definition of a mortgage loan under RESPA to exclude home equity loans.

Wells Fargo relies on Regulation X to argue that the Herrmanns' loan is not covered by RESPA because it is a home equity line of credit. (Dkt. No. 10 at 5.) The Herrmanns argue that Regulation X impermissibly narrows Congress's definition of a mortgage loan under RESPA. (Dkt. No. 11 at 7.) The Herrmanns primarily rely on *Hawkins-El v. First Am. Funding, LLC*, 891 F. Supp. 2d 402, 407-08 (E.D.N.Y 2012), and *Cortez v. Keystone Bank, Inc*., No. 98-2457, 2000 WL 536666, *10-11 (E.D. Pa. May 2, 2000), to advance their argument.

In *Hawkins-El*, the court held that RESPA applied to plaintiff's home equity line of credit. 891 F. Supp. 2d at 407. The court reasoned that "RESPA's implementing regulations, which provide that the qualified written request provision 'does not include subordinate lien loans'" "'directly conflicts with the language in RESPA that includes subordinated liens in its borrower inquiry provisions." *Id.* at 408 (quoting *Cortez*, 2000 WL 536666, at *11) (citing *MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 901 n.7 (N.D. Ill. 2000) (noting in dicta that the regulation conflicts with RESPA)). The court found that the implementing regulation and the

---

[1] The definition of a "federally regulated mortgage loan" in 12 C.F.R. § 1024.2 largely mirrors the definition in 12 U.S.C. § 2602(1) of RESPA.

8

statute were incompatible and "[t]herefore, the court follow[ed] RESPA's more inclusive statutory language, because an administrative agency's regulation is ineffective to the extent it conflicts with its parent statute." *Id.* (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977) ("For regulations, in order to be valid must be consistent with the statute under which they are promulgated.")).

Similarly, in *Cortez*, the court held that RESPA applies to home equity lines of credit. No. 98-2457, 2000 WL 536666, at *11. The court reasoned that "[t]he language in Regulation X which exempts from coverage under RESPA home equity lines of credit . . . directly conflicts with the language in RESPA which expressly extends a lender's duties to borrower inquiries regarding the 'servicing' of any 'federally related mortgage loan.'" *Id.* (quoting 12 U.S.C. § 2605(e)(1)(A)). "Insofar as an agency regulation conflicts with the statute under which it was promulgated, the regulation is ineffective." *Id.* (citing *LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n*, 866 F.2d 616, 623 (3d Cir. 1989)).

Wells Fargo argues that not only are *Hawkins-El* and *Cortez* not controlling, they were decided before the current version of Regulation X was published. (Dkt. No. 13 at 2.) Wells Fargo is correct that these cases analyze predecessor regulations to 12 C.F.R. § 1024.31, but these predecessor regulations also excluded certain home equity loans from RESPA. *See e.g. Cortez*, No. 98-2457, 2000 WL 536666, at *11 (24 C.F.R "§ 3500.7(f) (exempting open-end home equity lines of credit covered by TILA and Regulation Z from good faith estimate of settlement costs requirement); § 3500.8(a) (exempting open-end home equity lines of credit covered by TILA and Regulation Z from use of HUD settlement statement"). Moreover, in 2019, well after the current version of Regulation X was published, the Third Circuit Court of

9

Appeals applied a RESPA analysis to a dispute regarding a home equity loan. *Cole v. Wells Fargo Bank, N.A.*, 790 F. App'x 460, 464 (3d Cir. 2019).

Although this issue has not yet come before the Fourth Circuit, the court is persuaded by the reasoning of *Hawkins-El* and *Cortez*. Congress's definition of a federally regulated mortgage loan under RESPA includes home equity loans and thus provides such borrowers access to the inquiry provisions under RESPA. Regulation X conflicts with this definition by excluding home equity loan borrowers from the protections of the RESPA. Therefore, the court will rely on the language of the statute and find that the Herrmanns claim regarding their home equity is proper under RESPA.

### 2. The Herrmanns' QWRs and Wells Fargo's Responses

RESPA empowers borrowers to request certain information from their loan servicers regarding their loans by way of a QWR:

> [A QWR is] a written correspondence, other than notice on a payment coupon or other payment medium supplied to the servicer, that—
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

When a servicer receives a QWR from a borrower, the servicer must, within 30 days:

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
> > (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

>> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
>
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
>> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
>>
>> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.   12 U.S.C. § 2605(e)(2).

"In order to state a claim for a violation of this section of RESPA, 'a plaintiff must allege facts to support that: (1) the defendant is a loan servicer, (2) the plaintiff sent the defendant a valid QWR, (3) the defendant failed to adequately respond within the statutory period . . . , and (4) the plaintiff is entitled to actual or statutory damages.'" *Bowman*, No. 4:13-CV-00063, 2014 WL 109463, at *3 (quoting *Arroyo v. Bank of America, N.A.*, Civil Action No. 1:13–cv–01767, 2013 WL 3785623, at *3 (N.D. Ga. July 18, 2013)).

There is no dispute that Wells Fargo is a loan servicer.  However, Wells Fargo disputes that the Herrmanns have adequately pled the remaining elements necessary for a violation of this section of RESPA.

### *i. The QWRs*

A valid QWR is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that: (1) enables the servicer to identify the name and account of the borrower; and (2) "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). "A servicer may, by written notice provided to a borrower, establish an address that a borrower must use to request information in accordance with the [QWR] procedures." 12 C.F.R. §

1024.36(b). "Based on this regulation, courts have held that where such an address has been designated for the receipt of QWRs, the failure to send a request for information to that address is fatal to a claim under RESPA." *Nash v. PNC Bank, N.A.*, No. CV TDC-16-2910, 2017 WL 1424317, at *7 (D. Md. Apr. 20, 2017) (citing *Roth v. CitiMortgage, Inc.*, 756 F.3d 178, 181–82 (2d Cir. 2014); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1149 (10th Cir. 2013); *Lupo v. JPMorgan Chase Bank, N.A.*, No. DKC-14-0475, 2015 WL 5714641, at *6 (D. Md. Sept. 28, 2015) (granting summary judgment to the defendant where the plaintiff failed to establish that the request for information was sent to the address designated for QWRs)).

Here, Wells Fargo argues that it "provided Plaintiffs with written notice of the sole means for requesting information about their account" and the Herrmanns did not send their QWRs to the specified address. (Dkt. No. 10 at 7.) Wells Fargo cites the Herrmanns' April 24, 2017 account statement which states, "If you'd like to request information, notify us of an error, or share any concerns you may have about the servicing of your line, please contact us at P.O. Box 10335, Des Moines, IA 50306." (*Id.*) Wells Fargo provides this account statement as an exhibit to its motion for judgment on the pleadings. (*Id.*) However, as the Herrmanns note, this account statement is not attached to or referenced anywhere in the complaint. (Dkt. No. 11 at 11.) Nor is the account statement integral to the Herrmanns' complaint. Therefore, the court will not consider the account statement at this time. As such, the Herrmanns have adequately pled that they sent valid QWRs to Wells Fargo.

###### ii. Wells Fargo's Responses

Pursuant to 12 U.S.C. § 2605(e)(2), a servicer must respond to a QWR by conducting an investigation to provide the borrower with a written explanation that provides "a statement of the reasons for which the servicer believes the account of the borrower is correct" and any

12

"information requested by the borrower or an explanation of why the information requested is unavailable." Regulation provides that the servicer's investigation must be reasonable. 12 C.F.R. § 1024.35(e)(1)(i)(B). "Given the ordinary meaning of 'investigation' and the purpose of RESPA, [some courts have] conclude[d] that § 2605(e)(2)(B)–(C) imposes a substantive obligation on mortgage loan servicers to conduct a reasonably thorough examination before responding to a borrower's qualified written request." *Wirtz v. Specialized Loan Servicing*, LLC, 886 F.3d 713, 717 (8th Cir. 2018); *see also Vilkovsky v. Specialized Loan Servicing*, LLC, No. 2:16-cv-1291, 2017 WL 839493, *6 (W.D. Pa. March 3, 2017); see also *Harris v. Nationstar Mortg. LLC*, No. CV CCB-19-3251, 2020 WL 4698062, at *8 (D. Md. Aug. 13, 2020) (holding that plaintiff adequately pled violations of RESPA and Regulation X based on the lack of a reasonable investigation); *Gillis v. Household Fin. Corp. III*, No. GJH-18-3923, 2019 WL 3412621, at *11 (D. Md. July 29, 2019) (finding that a servicer failed to conduct a reasonable investigation where it responded to QWRs with inaccurate account information).

Here, Wells Fargo argues that it met its obligations under RESPA because it provided thirteen detailed responses to the Herrmanns and "more than adequately explained why Wells Fargo believed no errors occurred on Plaintiffs' account." (Dk.t No. 10 at 9.) In addition, Wells Fargo provided "volumes of documents to support its analysis" and "one-by-one addressed Plaintiffs' concerns in a detailed and organized manner." (*Id.*) The Herrmanns argue that Wells Fargo failed to conduct a *reasonable* investigation because it provided the Herrmanns with "inconsistent and inaccurate explanations." (Dkt. No. 11 at 17.) In the letter from Wells Fargo dated April 19, 2019, the Herrmanns claim that Wells Fargo admitted that some of the calculations it provided in its earlier QWR responses were inaccurate. (Am. Compl. ¶ 79.) In Wells Fargo's October 18, 2019 letter, the Herrmanns allege that Wells Fargo "claimed that it

13

was unable to determine if it had provided inconsistent information to the Plaintiffs." (*Id.* ¶ 99.) These allegations suggest that Wells Fargo may have failed to conduct a reasonable investigation because it provided plaintiffs with incomplete and inaccurate information. The court must accept these allegations as true for purposes of this motion. Thus, for these reasons, the Herrmanns have adequately pled that Wells Fargo failed to reasonably investigate their account dispute in response to their QWRs.

### *iii. Damages*

If a servicer fails to comply with any of the provisions of 12 U.S.C. § 2605, it is liable to an individual borrower for "any actual damages to the borrower as a result of the failure" and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f)(1). "[T]here must be a 'causal link' between the alleged violation and the [actual] damages." *Renfroe v. Nationstar Mortg.*, LLC, 822 F.3d 1241, 1246 (11th Cir. 2016). "When a plaintiff plausibly alleges that a servicer violated its statutory obligations and as a result the plaintiff did not receive a refund of erroneous charges, she has been cognizably harmed." *Id.* at 1246–47.

Here, the Herrmanns allege that they suffered actual damages including the overpayment on their home equity loan that would have been refunded to them had Wells Fargo reasonably investigated their account. Although the Herrmanns also claim other damages, the alleged overpayment and failure to refund is sufficient to meet the damages element for the RESPA violation. For these reasons, the Herrmanns have sufficiently pled a violation of 12 U.S.C. § 2605(e), and the court will deny Wells Fargo's motion for judgment on the pleadings.

### C. Conversion

Wells Fargo argues that the Herrmanns' conversion claim is barred by the economic loss rule. "[T]he economic loss rule is intended to preserve the bedrock principle that contract damages be limited to those 'within the contemplation and control of the parties in framing their agreement.'" *City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 446 (4th Cir. 1990) (quoting *Kamlar Corp. v. Haley*, 224 Va. 699, 706 (1983)). The economic loss rule "prevent[s] a plaintiff from pasting an ill-suited tort label on a set of facts that supports nothing more than a breach of contract claim." *Id.* The rule "prevents a plaintiff, whose only legitimate ground of complaint is that a contract has been breached, from collecting in a tort action both economic loss damages and damages generally cognizable in tort." *Id.* "[A] party can, in certain circumstances, show both a breach of contract and a tortious breach of duty," but the duty "breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *Pre-Fab Steel Erectors, Inc. v. Stephens*, No. CIVA 6:08-CV-00039, 2009 WL 891828, at *8 (W.D. Va. Apr. 1, 2009) (quoting *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 558 (1998)); *see also Legacy Data Access, Inc. v. Cadrillion*, LLC, 889 F.3d 158, 165 (4th Cir. 2018) (concluding that North Carolina's economic loss rule barred a conversion claim).

The Herrmanns argue that "the duty Wells Fargo violated did not arise by contract" because "[a] cause of action for conversion lies independent of an action for contract, and may provide a separate basis, distinct from the contract, upon which one partner may sue another." (Dkt. No. 11 at 22 (quoting *PGI, Inc. v. Rathe Prods., Inc.*, 576 S.E.2d 438, 443 (Va. 2003)).) However, as Wells Fargo accurately explains, the Herrmanns rely on *PGI* which is distinct from the instant case. In *PGI*, "the Court found there was implied contract between the parties for a

15

joint venture and that to the extent the contract did not govern the party's rights, the law of partnerships would govern – which explicitly carved out an exception for one partner to sue another in tort." (Dkt. No. 13 at 12.) In this case, Wells Fargo and Herrmann had a contract regarding the home equity loan in dispute. Wells Fargo's duty to the Herrmanns regarding the loan arose out of that contract, not common law. For that reason, the economic loss rule applies, and the court will grant judgment on the pleadings in favor of Wells Fargo regarding the conversion claim.

**D. Motion for Leave to File Second Amended Complaint**

Federal Rule of Civil Procedure 15 provides that a party may amend its pleading with leave of the court and "[t]he court should freely give leave when justice so requires." Generally, "the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, the court may deny leave to amend for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* "An amendment is futile if the amended claim would fail to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Caperton v. Virginia Dep't of Transportation*, 2016 WL 4771290, at *4 (W.D. Va. Sept. 12, 2016) (citing *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995)). "[D]elay alone is not sufficient reason to deny leave to amend" and "must be accompanied by prejudice, bad faith, or futility." *Cominelli v. The Rector & Visitors of The Univ. of VA*, 589 F. Supp. 2d 706, 712 (W.D. Va. 2008) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).

Wells Fargo argues that the court should deny the Herrmanns leave to amend their complaint because it would be prejudicial and futile. Wells Fargo claims that it would be

prejudicial to grant the motion because "three-hundred and sixty-four days have passed between Plaintiffs' first Amended Complaint and their Motion" and during this time "Wells Fargo has expended significant time and resources investigating the facts, briefing the claims and legal theories Plaintiffs assert, and preparing for the mediation held in October 2020." (Dkt. No. 49 at 5.) While it is true that a great deal of time has elapsed since the Herrmanns filed their first amended complaint, the amendments they are seeking directly respond to the arguments Wells Fargo made in its motion for judgment on the pleadings. Specifically, the Herrmanns' proposed second amended complaint "removes the conversion claim, details many errors and contradictions in Defendant's explanations for its accounting, [] attached documents to prove them . . . [and] drops Plaintiffs' jury demand and [] claim for punitive damages." (Dkt. No. 22 at 2.) Therefore, these amendments should not be a surprise nor prejudicial to Wells Fargo. The parties have not yet started discovery, which also suggests that leave to file the amendment would not be prejudicial.

      With regard to futility, the court has now ruled on the motion for judgment on the pleadings and allowed the RESPA claim to move forward, but not the conversion claim. As such, the Herrmanns' proposed amendment, which adds the breach of contract claim in place of conversion, would not be futile. In addition, the court cannot conclude at this juncture that the Herrmanns breach of contract claim would fail to survive a 12(b)(6) motion to dismiss. For these reasons, the court will grant the Herrmanns motion for leave to file a second amended complaint.

## III.  CONCLUSION

For the reasons stated above, Wells Fargo's motion for judgment on the pleadings (Dkt. No. 9) will be granted as to Count II and denied as to Count I.  In addition, the court will grant the Herrmanns' motion for leave to file a second amended complaint (Dkt. No. 22).

Entered: March 29, 2021.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge